# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Avon State Bank,

                                    Civ. No. 12-2557 (RHK/LIB)
                    Plaintiff,      **MEMORANDUM OPINION
                                    AND ORDER**

v.

BancInsure, Inc.,

                    Defendant.

---

Margaret S. Brownell, Joseph P. Ceronsky, Maslon Edelman Borman & Brand, LLP, Minneapolis, Minnesota, for Plaintiff.

Mark J. Johnson, Joseph A. Nilan, Joshua A. Dorothy, Gregerson, Rosow, Johnson & Nilan, Ltd., Minneapolis, Minnesota, for Defendant.

---

## INTRODUCTION

This insurance-coverage dispute between Plaintiff Avon State Bank ("Avon") and its insurer, Defendant BancInsure, Inc. ("BancInsure"), arises from an Avon employee's involvement in an advance-fee scheme.[1]  The email-based scam promised victims a portion of a fictional $9 million estate if the victims helped transfer the estate from Senegal to the United States by wiring the perpetrator money for taxes and other fees. Avon's employee, Eric Carlson, fell prey to the scam, wiring $60,000 of his own money.

---

[1] "An advance fee scheme occurs when the victim pays money to someone in anticipation of receiving something of greater value—such as a loan, contract, investment, or gift—and then receives little or nothing in return."  http://www.fbi.gov/scams-safety/fraud (last visited Jan. 7, 2014).

Though beginning to doubt the legitimacy of his "investment," he nonetheless recruited others to invest as well.  He had them write out cashier's checks to Avon and then used Avon to wire their money—almost $500,000—to an offshore account.  When these "investors" never received their promised portion of the estate, they demanded Avon return their money and sued.  A state court jury concluded Carlson had fraudulently misrepresented the investment to them and Avon was liable for their losses.  BancInsure, which had been defending Avon throughout the suit, refused to indemnify Avon for the judgment and sought reimbursement for its defense costs, asserting Avon's policy with BancInsure did not cover fraud.  In response, Avon commenced this declaratory-judgment action against BancInsure, asking the Court to determine its coverage.  Both parties now cross-move for summary judgment on Avon's claims; for the reasons that follow, the Court will grant both Motions in part and deny both in part.

## BACKGROUND

*The "Investment" Scheme*

In January 2007, long-time Avon customer Ambrose Herdering was contacted by "David Gibson," who purported to be the son of an African associate with whom Herdering had done business.  Gibson claimed his father had passed away and left the family a $9 million estate, which they wanted to transfer to America, to Herdering's bank (i.e. Avon).  Gibson said the money was tied up in the Netherlands and he needed money to pay taxes and other fees.  Herdering sent money multiple times, as each time Gibson would inform him of another problem or delay in transferring the estate requiring further cash advances.  Herdering approached Carlson for help with the "Gibson estate,"

promising him huge rewards.  In summer 2007, Carlson issued Herdering a loan from

Avon to invest in the estate and he contributed $60,000 of his own money.  Glenn

Diedrich, President of Avon, was aware of the loan and contacted Herdering to express

his concern that the Gibson estate may be a scam.  At this time, Diedrich was not aware

of Carlson's personal involvement.

   In October 2007, Gibson asked them to pitch in half of a $750,000 tax on the

estate.  Having received nothing yet in return, Carlson expressed doubt about the

investment to Herdering, asking him in a letter, "Looking back, now that this looks to be

impossible, are you sure you really know these people?" (Trial Ex. 7).  Despite his

apparent reservations, Carlson decided to act on Gibson's request for further funds and

recruited new investors, Donald Imdieke and Mike Froseth, to provide them.  In his letter

to Herdering, Carlson acknowledged the move was "risky" but added, "what have we got

to lose?  Paying more tax is better than not getting anything out of this."  He wrote, "I

know I am going to lose what I put in, but I am not going to be on the hook to pay

[Froseth] back." (Id.)  So, in an effort to raise enough money to pay the alleged tax,

Carlson told Imdieke and Froseth about the investment and assured him he had

researched it and he was "100 percent sure that it was legit." (Trial Tr. at 145–46.)  He

promised them they could double their money in a matter of weeks. (Id. at 146.)  He had

them write checks payable to Avon and led them to believe the bank was investing the

money. (Id. at 147, 172.)  Froseth wrote a check to Avon for $405,000 and Imdieke

wrote a check for $80,000.

Carlson first deposited Froseth's check and wired the money to the "Otua Auto Company" account at the "Taipei Fubon Bank" in Hong Kong on October 19.  As neither Froseth nor Imdieke were Avon customers, it was against the bank's policy to wire money on their behalves.  To get around this, Carlson told Avon's Vice President and Auditor, Rose Blascziek, that the people requesting the wire would not receive their "merchandise" if she did not approve the wires and so she did.  (Id. at 263–65.)  He attempted to contact the bank in Hong Kong to confirm the wire transfer and the legitimacy of the destination account but did not hear back.  On November 4, he accepted Imdieke's check and held the check in the bank while waiting for confirmation on the first wire transfer.  Despite never receiving confirmation, he wired Imdieke's $80,000 on November 30.  Needless to say, none of the "investors," including Carlson, ever received the promised returns.

*The Underlying Lawsuit*

More than a year later, on January 6, 2009, Froseth and Imdieke met with Diedrich about Carlson and the Gibson-estate transactions.  They showed Diedrich copies of the checks they had made out to Avon and demanded the bank return their money.  Until this meeting, Diedrich was unaware Carlson, Froseth, or Imdieke had been involved in the scheme.  Suspicious, Diedrich called BancInsure and notified them he was concerned an employee might have been stealing from the bank, but was not yet sure.  The BancInsure employee he spoke with suggested he call the Claims Department, but Diedrich declined.

Diedrich immediately suspended Carlson and eventually terminated him.  Avon wrote to Froseth and Imdieke, expressing its position that any "investment" they made

-4-

with Carlson was Carlson's personal dealing and did not involve the bank.  Through

counsel, Froseth and Imdieke continued to correspond with Avon periodically.  In

October 2009, Diedrich received a letter threatening litigation against the bank.  The

letter alleged Froseth and Imdieke made deposits "based on misrepresentations of a bank

officer" that the bank was handling the transaction and that neither he nor the bank had

authority to transfer the funds out of the bank.

Diedrich emailed a copy of this letter to BancInsure on November 2, with the

subject line, "Bond #22FIB00372-8," explaining he would keep BancInsure "apprised of

the situation that started in January 2009."  BancInsure responded, acknowledging

"notice of a potential claim" under the bank's Directors' and Officers' Liability Policy

("D&O Policy"),[2] and assigned the file to a claims-adjustment firm for investigation.

Several months later, in response to Diedrich's inquiry regarding coverage, BancInsure

stated that it had "not denied the claim," and since the claim was "under a D&O policy

there [wa]s no claim at th[at] time, since there [wa]s no lawsuit" yet.  In May 2010,

Froseth and Imdieke sued Avon for negligent and fraudulent misrepresentation and

BancInsure agreed to provide coverage under the D&O Policy and reserved its rights.

At trial, Froseth and Imdieke dropped their negligent misrepresentation claims and

maintained only *fraudulent* misrepresentation claims against Avon, seeking to hold it

vicariously liable for Carlson's conduct.  In January 2012, the jury returned a special

---

[2] Although the basic policy covers only Avon's *indemnification* of its directors and officers for
*their* liability, Avon purchased additional entity coverage—set forth in the "Bankers Errors and
Omissions Endorsement" ("E&O Endorsement")—that covers Avon's own liability as well.  For
simplicity's sake, the Court refers to the basic policy *and* all incorporate endorsements as the
"D&O Policy."

verdict in favor of the plaintiffs, concluding Carlson had breached his duty to disclose

material information about the "investments" to plaintiffs and he did so within the course

of his employment with Avon.  The court entered judgment against Avon and in August

2012, while post-trial appeals were pending, the parties settled.  On August 16, 2012,

Avon provided BancInsure with a Sworn Statement in Proof of Loss.

*The Insurance Dispute*

After the jury reached its decision, BancInsure informed Avon that the judgment

was *not* covered by BancInsure because the D&O Policy excluded liability resulting from

fraudulent acts, and it requested Avon reimburse it for defense costs.  Avon hired new

counsel and challenged the denial of coverage, asserting the judgment and defense costs

were covered not only under the D&O Policy, but also under a fidelity bond Avon had

purchased from BancInsure, the Financial Institution Bond (the "Bond").[3]  BancInsure

responded that the Bond did not cover losses to third parties—namely, Froseth and

Imdieke—for which the bank was responsible, it only covered losses to the bank itself.  It

also asserted that any claim under the Bond was, by that point, time-barred.

On October 5, 2012, Avon commenced the instant action, asserting claims against

BancInsure for declaratory judgment and breach of contract under the Bond and the D&O

Policy, and for breach of the implied covenant of good faith and fair dealing.  BancInsure

---

[3] Avon purchased three fidelity bonds from BancInsure between 2007 and 2013, each of which provided coverage for a three-year term.  BancInsure contends, and the Court agrees, that the 2007 fidelity bond is the relevant Bond, as Avon discovered its loss during the bond's term of coverage, which began February 2007 and ended February 2010.  (See Bond, § 3 ("This Bond applies to loss discovered by the Insured during the Bond Period.").)  Accordingly, the Court refers to and quotes from the 2007 Bond only.

counterclaimed for declaratory judgment and breach of contract.  Both parties now move

for summary judgment on Avon's claims.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the

nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett,

477 U.S. 317, 322–23 (1986).  The moving party bears the burden of showing that the

material facts in the case are undisputed.  Id. at 322; Whisenhunt v. Sw. Bell Tel., 573

F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that

may be reasonably drawn from it, in the light most favorable to the nonmoving party.

Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v.

Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on

mere allegations or denials, but must show through the presentation of admissible

evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528

F.3d 1074, 1078–79 (8th Cir. 2008).

Where, as here, the Court confronts cross-motions for summary judgment, this

approach is only slightly modified.  When considering Avon's Motion, the Court views

the record in the light most favorable to BancInsure, and when considering BancInsure's

Motion, the Court views the record in the light most favorable to Avon.  "Either way,

summary judgment is proper if the record demonstrates that there is no genuine issue as

to any material fact." <u>Seaworth v. Messerli</u>, Civ. No. 09-3437, 2010 WL 3613821, at *3

(D. Minn. Sept. 7, 2010) (Kyle, J.), <u>aff'd</u>, 414 F. App'x 882 (8th Cir. 2011) (per curiam).

## ANALYSIS

Avon purchased two insurance policies from BancInsure—a fidelity bond and a

liability policy.  "The difference between liability insurance and fidelity bonding is that

[liability] insurance covers the liability of the insureds to a third-party, while fidelity

bonding covers the loss of property owned by the insureds or held by the insureds, as a

consequence of employee dishonesty." <u>Cargill, Inc. v. Nat'l Union Fire Ins. Co. of

Pittsburgh</u>, No. A03-187, 2004 WL 51671, at *11 (Minn. Ct. App. Jan. 13, 2004).[4]

Accordingly, Avon's Bond from BancInsure covers the bank's loss resulting directly

from its employee's dishonest or fraudulent conduct and its D&O Policy (a liability

policy) covers losses to third parties for which Avon or its director, officer, or employee

is held liable.

Avon asserts its loss is covered under both the Bond and the D&O Policy, while

BancInsure contends it is covered by neither.  BancInsure argues the Bond covers

primarily first-party losses, not liability to third-parties, as is the case here.  And while

liability to third parties is generally covered by the D&O Policy, BancInsure contends

Avon's liability here is excluded because it resulted from an employee's fraud.  Finally,

---

[4] "In insurance coverage actions involving diversity of citizenship," such as this, "state law
controls [the Court's] analysis of the insurance policy." <u>Nat'l Am. Ins. Co. v. W&G, Inc.</u>, 439
F.3d 943, 945 (8th Cir. 2006).  Under Minnesota law, which all parties agree is applicable here,
the insured bears the initial burden of demonstrating coverage and the insurer bears the burden of
establishing the applicability of exclusions. <u>Travelers Indem. Co. v. Bloomington Steel &
Supply Co.</u>, 718 N.W.2d 888, 894 (Minn. 2006).

even if the loss were covered under the Bond, BancInsure argues any claim thereunder is now time-barred.  The Court will address each of these arguments in turn.

## I.      Coverage Under Avon's D&O Policy

Although the D&O Policy, as a liability policy, would seem the most logical source of coverage for Avon's loss, the Policy excludes coverage for losses resulting from fraudulent acts such as Carlson's.  The D&O Policy provides that BancInsure will indemnify "Loss . . . which the Insured shall become legally obligated to pay, provided Claim or Claims for such Loss is first made against the Insured . . . and that such Claim or Claims have arisen out of any Wrongful Act."  (E&O Endorsement, § 1.)  "Wrongful Act" is defined as "any actual or alleged error, misstatement, misleading statement, act or omission, or neglect of [*sic*] breach of duty by the Insured."  (Id. § II.D.)  The Policy *excludes* coverage for "Loss in connection with any Claim made against the Insured Persons based upon . . . any fraudulent, dishonest or criminal actions of the Insured Persons."  (D&O Policy, § V.4.)  Although this exclusion was written with Avon's directors and officers in mind—the "Insured Persons"—the additional entity coverage Avon purchased, which covers its direct liability, incorporates this exclusion and applies it to the "Insured," which is defined as Avon and "its employees acting within the scope of their employment."  (E&O Endorsement, §§ II.A, IV.)

BancInsure denied Avon coverage under this exclusion, asserting that the claims against Avon were based upon Carlson's fraudulent actions and thus barred by the Policy.  While Avon agrees that the claims against it were based upon Carlson's

-9-

fraudulent actions, it asserts that the exclusion only applies if *Avon* acted fraudulently.[5] It contends that Carlson and Avon are separate "Insureds" and the Policy exclusion requires the claims to be asserted against the *same* "Insured" who engaged in fraudulent actions. It bases this interpretation on the Policy's use of "the" Insured, rather than "an" or "any" Insured. It also cites a "severability clause" in the Policy, providing that "[n]o fact pertaining to or knowledge possessed by any Insured Person shall be imputed to any other Insured Person for the purposes of applying the exclusions."

But Avon's proposed interpretation of the fraudulent-act exclusion would render it meaningless as to Avon. See Chergosky v. Crosstown Bell, Inc., 463 N.W.2d 522, 526 (Minn. 1990) (courts "will attempt to avoid an interpretation of the contract that would render a provision meaningless"). Avon can only act through its employees, officers, and directors and thus any claim against Avon "based upon . . . fraudulent . . . actions" is necessarily based upon the fraudulent actions of an individual representing the bank, such as an employee acting within the scope of his employment. See Steadfast Ins. Co. v. Stroock & Stroock & Lavan, LLP, 108 F. App'x 663, 666 (2d Cir. Aug. 5, 2004). Because the jury found Carlson acted within the scope of his employment, his fraudulent misrepresentations were *Avon's* fraudulent misrepresentations. Thus, Avon's liability in the underlying suit falls within the D&O Policy's fraudulent-acts exclusion; BancInsure

---

[5] Avon also contends that the exclusion only applies to *intentional* acts. But to read an intentional-act requirement into the policy would erroneously expand upon its plain language, which requires only that a fraudulent act occurred. See SECURA Supreme Ins. Co. v. M.S.M., 755 N.W.2d 320, 325 (Minn. Ct. App. 2008) (refusing to read an intentional-act exclusion into a criminal-act exclusion).

properly denied coverage under that Policy and is entitled to summary judgment on

Counts I and II.

## II.  Coverage Under Avon's Bond

### A. Covered Losses

Under Insuring Agreement (A) of the Bond, BancInsure promised to indemnify

Avon, the "Insured," for "[l]oss resulting directly from dishonest or fraudulent acts

committed by an Employee."  (Bond at 1.)  While BancInsure reads this "direct" loss

requirement as covering primarily first-party loss of the insured's own property, it

acknowledges the Bond provides "limited" coverage for the loss of a third-party's

property resulting directly from employee misconduct as well.  (Def.'s Mem. in Opp'n at

35.)  This third-party coverage is clarified in Section 10 of the Bond, which provides the

Bond applies not only to the loss of property *owned* by the insured, but also property

"*held* by the Insured in any capacity."  (Bond at 23 (emphasis added).)  BancInsure

contends Avon did not "hold" Imdieke's or Froseth's money and therefore its loss does

not fall within the scope of covered third-party losses.

In order to have "held" property within the meaning of Section 10, BancInsure

asserts that Avon must have "possessed and controlled the money prior to the

misappropriation that created liability."  (Def.'s Mem. in Opp'n at 36.)  In support of its

contention that Avon did not possess and control the money, it offers that (1) the

cashier's checks were from another bank, (2) Froseth and Imdieke were not bank

customers and did not have accounts at Avon, and (3) Carlson intended to (and did) wire

the money out of Avon.  (Id. at 36–37.)  Thus, BancInsure characterizes Avon as "merely a conduit." (Id. at 37.)  But this characterization underestimates Avon's role.

Carlson—*in the course of his employment with Avon*—solicited investments from Froseth and Imdieke and represented that *Avon* would be handling the money.  They wrote out checks payable to *Avon*.  Although they were not customers of Avon, their checks were *deposited into and held by Avon* for some amount of time (although the parties dispute the duration).  Finally, with the approval of Avon's Vice President and Auditor, Rose Blascziek, *Avon* wired the funds to offshore accounts.  These facts establish that Avon both possessed and controlled Froseth's and Imdieke's funds and the funds were therefore "held" by Avon, even under BancInsure's own definition.  This brings the loss of those funds squarely within Section 10, which specifies that the Bond applies to the loss of a third-party's funds held by Avon.

In support of its contention that Avon's liability is not a covered loss, BancInsure relies on Cargill, 2004 WL 51671, at *11.  There, a Cargill employee stole and used intellectual property belonging to another company for Cargill's benefit, Cargill was held liable for the employee's actions, and the court upheld its insurer's denial of coverage.  But there, the court recognized that Cargill's fidelity bond *covered the loss of property held by the insured*, and concluded its liability was not covered because Cargill neither held nor owned the intellectual property its employee stole.  Thus, "Cargill's claim was based not on 'loss of third-party property in its possession' as [this] claim is, but rather on theft committed against third-parties by its employees.  The Cargill court . . . grasped th[is] crucial difference, observing that the former *is* covered by fidelity insurance while

the latter is not." RBC Dain Rauscher, Inc. v. Fed. Ins. Co., 370 F. Supp. 2d 886, 890 n.3 (D. Minn. 2005) (Doty, J.) (emphasis added) (citation omitted) (distinguishing Cargill and concluding fidelity bond covered loss of third-party's funds held by the insured, a wealth-management company, as a result of its employee's dishonesty).  Although the court denied the insured coverage, the court's analysis of fidelity-bond coverage in Cargill supports the opposite conclusion here.

Having concluded that Avon suffered a loss of covered property as a direct result of Carlson's fraudulent actions, the Court must also examine whether Avon has proven Carlson acted with the requisite intent, which BancInsure disputes.  As a condition of coverage, Insuring Agreement (A) requires that the employee's fraudulent acts were "committed . . .  with manifest intent: (a) to cause the Insured to sustain such loss, or (b) to obtain improper financial benefit for the Employee or another person."  (Bond at 1.)  "Manifest intent" is not defined in the Bond, so the Court looks to Minnesota law, which deems a person to intend the natural consequences of his actions or omissions. Transamerica Ins. Co. v. FDIC, 465 N.W.2d 713, 716 (Minn. Ct. App. 1991), aff'd in part and rev'd in part on other grounds, 489 N.W.2d 224 (Minn. 1992).  The Bond specifies that, for the purpose of the Insuring Agreements, "financial benefits" do not include employee benefits earned in the normal course of employment, such as salaries, commissions, or bonuses.  (Bond at 1.)

The Court need not dwell on this point, as Carlson's actions and omissions plainly show he committed fraud in order to gain an improper financial benefit.  When he recruited Froseth and Imdieke, he had already put his own $60,000 at risk and had told

Herdering that he believed sending more money was his only chance to save his investment.  (See Trial Ex. 7 ("[W]hat have we got to lose?  Paying more tax is better than not getting anything out of this.").)  This demonstrates he induced Froseth and Imdieke to invest in an effort to save his own skin.  The evidence also demonstrates that he used Avon to gain improper financial benefit for himself.  Although he represented the investments were through Avon, deposited the money with Avon, and used Avon to transfer the money, his secrecy belies any contention that he was acting to benefit Avon.  Rather, by hiding the investments from Avon's officers and lying about the transactions, it is clear that he was intending to reap their potential benefits himself.  These actions and omissions, testified to at trial, are more than adequate to establish Carlson acted with manifest intent to gain improper financial benefit for himself at Avon's expense.

### B.  Timeliness of Avon's Claim

BancInsure argues that even if Avon's loss were covered by the Bond, Avon did not timely notify BancInsure of its claim or commence suit against it.  BancInsure cites three restrictions with which Avon allegedly failed to comply:  a notice requirement, a proof-of-loss requirement, and a suit limitation.  The Court concludes Avon complied with each restriction to the extent possible and therefore none precludes its claim.

### i.    Notice

The Bond requires Avon to notify BancInsure of the loss "[a]t the earliest practicable moment, not to exceed sixty (60) days" after the loss is discovered.  (Bond, § 5(f).)  Section Three of the Bond provides that a loss is deemed "discovered" when a director or officer of Avon "first becomes aware of facts which would cause a reasonable

-14-

person to assume that a loss of a type covered by this Bond has been or will be incurred"
*or* "receives notice of an actual or potential claim in which the Insured is liable to a third
party under circumstances which, if true, would constitute a loss under this Bond."
(Bond, § 3.)  Under either definition of "discovery," Avon complied.

Avon's President, Diedrich, first became aware of Froseth's and Imdieke's losses
and the bank's potential involvement at their meeting on January 6, 2009, and within an
hour, he contacted BancInsure's Service Center to let them know he was suspicious.
BancInsure disputes whether this phone call constituted "notice of the loss," because
Diedrich did not report it to BancInsure's Claims Department.  But the notice provision
does require Avon to file a claim or contact the Claims Department specifically.
Considering Diedrich's lack of information at the time, the Court concludes his phone
call was adequate notice and well within the required sixty days.  Moreover, when Avon
got wind of a potential claim against it by letter on October 26, 2009, Diedrich forwarded
the letter to BancInsure within a week—again, well within the required sixty-day
timeframe.  Thus, BancInsure had prompt and adequate notice of Avon's potential loss
under either definition of its discovery.

    *ii.*    *Proof of Loss*

The Bond also requires Avon to provide BancInsure with "proof of loss, duly
sworn to, with full particulars" within six months of its discovery.  (Id. § 5(d).)
BancInsure argues Avon's claim is barred by this provision because it required Avon to
file a proof of loss by April 26, 2010, at the latest.  While Avon may have received notice
of a *potential* claim in October 2009, it was impossible to file a proof of loss within six

months of that "discovery" because Avon could not yet confirm it suffered a loss, let alone swear to its "full particulars." See Citizens State Bank v. Capitol Indem. Corp., CI-95-321, 1995 WL 421672, at *4 (Minn. Ct. App. July 18, 1995) (bank had insufficient proof of loss until completion of customer's bankruptcy proceeding and thus could not have filed proof of loss earlier). The earliest date at which it could have filed a proof of loss was February 17, 2012, when the exact amount of the judgment against it was entered. And within six months of that date, Avon provided BancInsure with a duly sworn proof of loss. Thus, Avon complied with the proof-of-loss requirement to the extent possible.

But the Court is not persuaded that Avon's compliance with this term was even necessary. BancInsure led Avon to believe its loss was covered under the D&O Policy and not the Bond up through January 2012, implying that filing a proof of loss under the Bond—or pursuing coverage under the Bond in any other manner—was futile. By leading Avon to believe it was not necessary to file a proof of loss under the Bond, BancInsure effectively waived the requirement. See Nathe Bros., Inc. v. Am. Nat'l Fire Ins. Co., 597 N.W.2d 587, 591 (Minn. Ct. App. 1999) (acknowledging waiver for proof of loss where words or conduct imply it is unnecessary). BancInsure cannot use Avon's failure to provide proof of loss as evidence that Avon did not comply with the Bond when BancInsure itself implied Avon should not do so.

### iii. Suit Limitations

Finally, the Bond contains a limitations provision barring any suit under the Bond commenced more than two years after discovery of the loss. (Bond, § 5(f).) Avon

commenced the instant action on October 5, 2012.  BancInsure argues this exceeded the two-year limitation, based on its contention that Avon discovered the loss in January 2009 or October 2009, at the latest.  Avon, in response, asserts that BancInsure is estopped from enforcing its suit-limitations provision.  An insurer is estopped from asserting a suit-limitation clause as a defense to a claim when it would be "unjust, inequitable, or unconscionable" to do so.  L&H Transport, Inc. v. Drew Agency, Inc., 403 N.W.2d 233, 227 (Minn. 1987) (quotations omitted).

To establish the defense of estoppel, Avon must show that BancInsure made representations that it relied on to its detriment.  Id.  Avon contends that BancInsure represented it was covered under the D&O Policy and not the Bond up until it denied coverage under the D&O Policy on January 19, 2012, and that BancInsure did not definitively deny coverage under the Bond until August 29, 2012.  Avon contends it relied on these representations to its detriment by not suing BancInsure for coverage. The Court agrees with Avon that it would be not only unjust but perverse to punish it for failing to sue an insurer that had not yet denied coverage *and was meanwhile defending Avon in the underlying suit*.  Accordingly, and considering Avon commenced suit against BancInsure within months of receiving a definitive denial of coverage, BancInsure is estopped from asserting its suit-limitations provision against Avon.

In conclusion, Avon has established its loss is covered under the Bond and the Court will grant summary judgment in its favor on Counts III and IV.

III.     **Breach of the Covenant of Good Faith and Fair Dealing**

In its second claim, Avon asserts BancInsure breached the covenant of good faith and fair dealing, which is implied in all contracts under Minnesota law.  To establish a violation of the covenant, "a party must establish bad faith by demonstrating that the adverse party has an ulterior motive for its refusal to perform a contractual duty."  See Sterling Capital Advisors, Inc. v. Herzog, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998). The covenant ensures that one party does not unfairly prevent a condition from occurring or make it impossible for the other side to perform.  See In re Hennepin Cnty. 1986 Recycling Bond Litig., 540 N.W.2d 494, 502 (Minn. 1995).  Avon asks the Court to find BancInsure breached the covenant of good faith and fair dealing for its improper construction of the Bond and D&O Policy, failure to indemnify under either the Bond or Policy, and failure to disclose that the Bond may apply.  While the Court concludes that BancInsure erred in denying coverage to Avon under the Bond, Avon has presented no evidence that BancInsure acted in bad faith.  Accordingly, Avon has failed to establish BancInsure breached the covenant and the Court will grant BancInsure summary judgment on Count V.

**CONCLUSION**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Avon's Motion for Summary Judgment (Doc. No. 24) and BancInsure's Motion for Summary Judgment (Doc. No. 42) are each **GRANTED IN PART** and **DENIED IN PART**.  BancInsure's Motion is **GRANTED** as to Counts I, II, and V of the Complaint (Doc. No. 2) and those Counts are **DISMISSED WITH PREJUDICE**;

the Motion is **DENIED** as to all other Counts.  Avon's Motion is **GRANTED** as to

Counts III and IV of the Complaint (Doc. No. 2) and Counts I and II of BancInsure's

Answer and Counterclaims (Doc. No. 10), which Counts I and II are **DISMISSED**

**WITH PREJUDICE**[6]; Avon's Motion is **DENIED** as to all other Counts.

The Court **DECLARES** and **ADJUDGES** that Avon's loss is covered by the

terms of its 2007 Financial Institution Bond and BancInsure is therefore obligated to

indemnify Avon for the judgment and ensuing settlement agreement in the action entitled

Donald Imdieke and Mike A. Froseth v. Ambrose Joseph Herdering, Avon State Bank,

and Glenn Diedrich, Stearns County Court File No. 73-CV-10-923, and for its post-

verdict defense costs.  Avon is further entitled to recover attorneys' fees and costs

reasonably incurred in this action.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated:  January 10, 2014

                                                  s/Richard H. Kyle
                                                  RICHARD H. KYLE
                                                  United States District Judge

---

[6] BancInsure asserted two counterclaims against Avon, seeking reimbursement of its defense costs.  Avon has moved for summary judgment on these counterclaims but neither party addresses them in their briefing.  Given that the Court has concluded Avon's loss was covered by the Bond and the Bond requires BancInsure to pay Avon's court costs and reasonable attorneys' fees incurred in the underlying suit (see Bond, General Agreement (F) at 12 ("[BancInsure] shall indemnify the Insured against court costs and reasonable attorneys' fees incurred" in defending any suit against the Insured "on account of any loss, claim or damage which, if established against the Insured, would constitute a collectible loss under this Bond.")), the Court will grant Avon summary judgment.